UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
REGGIE REID,

                    Petitioner,

                                                    **MEMORANDUM AND ORDER**

       - against -                                  12-CV-3371 (RRM)

DANIEL MARTUSCELLO, Superintendent,
ERIC T. SCHNEIDERMAN, former New York State
Attorney General

                    Respondents.
-----------------------------------------------------X
ROSLYNN R. MAUSKOPF, Chief United States District Judge.

       Petitioner Reggie Reid brings this petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254, challenging his March 23, 2007, conviction in New York State Supreme Court,

Kings County, on two counts of robbery in the first degree and three counts of robbery in the

second degree.  (Pet. (Doc. No. 1-2).)  For the reasons set forth below, the petition is dismissed.

## BACKGROUND

       On September 14, 2001, several individuals were robbed at Seagate Medical Center in

Coney Island, Brooklyn ("Seagate").  (Pet. at 12.)[1]  Petitioner Reggie Reid and Ricardo Mendez

were subsequently indicted on five counts of robbery in the first degree, six counts of robbery in

the second degree, robbery in the third degree, grand larceny in the fourth degree, and petit

larceny.  (Respondents' Affidavit in Opposition to Petition ("Opp.") (Doc. No. 5) at ¶ 5.)

Mendez was also charged with criminal possession of a controlled substance.

       In 2002, following a joint trial with Mendez, a jury convicted Reid of two counts of

robbery in the first degree and one count of robbery in the second degree.  As explained further

---

[1] Page numbers for all documents refer to pagination assigned by the Court's Electronic Case Filing system.

*infra*, his conviction was ultimately reversed. *See People v. Reid*, 22 A.D.3d 690 (2d Dep't 2005). Reid and Mendez's joint retrial in 2006 is the subject of the instant petition.

### I.      The Investigation

On September 16 and 17, 2001, Detectives Dalton and John Closs of the 60th precinct were assigned to investigate the robbery. The detectives came to identify Reid as a suspect and on October 1, 2001, Closs went to Seagate to show some of the employees a photo array with Reid's picture. (Pre-trial Hearing Tr. (Doc. No. 5-2) at 15.) Seagate employees Andre Sanzharevsky, Igor Shulgin, Dr. Jacobs, a chiropractor, and Svetlana Tachenka, a Seagate receptionist, each viewed the photo array separately. Both Sanzharevsky and Shulgin identified Reid, while Tachenka and Dr. Jacobs were unable to identify anyone. (*Id*. at 16–18.)

The next day, on October 2, 2001, Closs conducted a lineup at the 60th Precinct. (Trial Transcript ("Tr.") (Doc. No. 5-3) at 141.) Zakharov, a former office manager at Seagate, Sanzharevsky, and Dr. Jacobs viewed a six-person lineup, which included Reid, through a one-way glass. (*Id*.) Both Zakharov and Sanzharevsky, viewing the lineup separately, identified Reid, though only Zakharov testified at trial. (Pre-trial Hearing Tr. at 29–30.) Dr. Jacobs did not identify anyone. (Tr. at 163.) Photographs of the lineup were received into evidence. (Tr. at 147–48.)

Following the lineup, Closs arrested Reid and learned that he was 37 years old, 5'10" tall, and lived approximately one block from Seagate. (Tr. at 149–50, 158–59.) On October 4, 2001, Mendez was arrested, after which he made a confession that is central to the instant petition.

### II.     The 2002 Trial and Direct Appeal

Reid and Mendez faced a joint trial in 2002. Reid was convicted by a jury of two counts of robbery in the first degree and one count of robbery in the second degree, and he was

sentenced as a predicate violent felony offender to an aggregate prison sentence of thirty-two years.  (Opp. at ¶ 6.)

Reid pursued a timely appeal to the New York State Supreme Court, Appellate Division, Second Department (hereinafter "Appellate Division").  He raised several points of error, including:  (1) the People's evidence was legally insufficient; (2) Zakharov's lineup identification should have been suppressed; (3) the prosecutor committed a *Rosario* violation by failing to disclose a page of handwritten notes pertaining to Lugo; and (4) defense counsel provided Reid with ineffective assistance of counsel.  (Opp. at ¶ 7.)

Reid's conviction was ultimately reversed based on prosecutorial misconduct – a claim that Reid did not in fact raise, but that Mendez raised in his appeal.  The Court found that the prosecutor's summation unfairly suggested that more than one witness had identified Reid, and ordered a new trial as a matter of discretion "in the interest of justice."  *See People v. Reid*, 22 A.D.3d 690 (2d Dep't 2005).  The Court held that, "[i]n light of the less than overwhelming evidence of guilt adduced at trial, the prosecutor's misconduct . . . cannot be considered harmless."  *Id*. at 689.

### III.    The 2006 Trial

The retrial was tried by a different prosecutor, before a new jury and judge – New York State Supreme Court Justice Guy Mangano, Jr.  The People relied on Zakharov as the primary eyewitness.  (Tr. at 5.)  On the afternoon of September 14, 2001, three days after the 9/11 terrorist attack, Zakharov was at work, watching the news and talking with his colleagues Sanzharevsky and Shulgin.  (*Id*. at 8.)  They were in a room with the door open, across from chiropractor Marc Jacobs' office.  (*Id*. at 10.)  Zakharov recalled seeing a black man peek inside the room he was in for a few seconds, taking "a good look around" before disappearing.  (*Id*. at

9–11.)  Assuming the man was a patient, Zakharov and his colleagues did not find it suspicious.  (*Id*. at 11.)  However, when the man reappeared, it was clear he planned to rob Seagate.

The man, who Zakharov later identified as Reid, subsequently reappeared, along with a shorter, Hispanic man.  (Tr. 13, 16, 18, 26–27, 37–38, 80.)  Based on the bluge in Reid's pocket, Zakharov testified that he "saw what [he] believed to be a firearm." (Tr. at 14; *see also* 54, 62–64, 87.)  According to Zakharov, Reid demanded to know where the money was kept and threatened to shoot any resistors, saying, "where is the fucking cash," and "I will blow your heads off."  (*Id*. at 16.)  After being directed to a safe and finding no money there, the men robbed Zakharov and his two co-workers.  Reid took Zakharov's Fendi watch, worth $450, as well as $30 or $40 in cash.  (*Id*. at 24–26.)  Zakharov also saw Reid take cash, a "very expensive gold bracelet," and a Cartier watch from Shulgin and Sanzharevsky.  (*Id*. at 23–24.)

Zakharov stated that when he tried to call 911, Reid ripped the phone cord from the wall and said that the police would not help, as they were preoccupied with the aftermath of 9/11.  (Tr. at 22.)  Reid allegedly said, "I freaking dare you, nobody is going to come and help you, everybody is down at the World Trade Center . . . . " (*Id*.)  Zakhoarov estimated that the entire incident lasted five to ten minutes before the men left.  (*Id.* at 30, 64, 59, 78.)

Dr. Jacobs testified that he was at his desk that afternoon, across the hall from Zakharov, when a physical therapist entered his office, "muttering, oh my God."  (*Id*. at 104.)  Before she could explain, a Hispanic man wearing a sweatshirt, hood up, appeared behind her.  (*Id*. at 105, 111.)  The man proceeded to steal $150 in cash from Dr. Jacobs and other valuables, including watches and jewelry, from the physical therapist, as well as an acupuncturist and a patient.  (*Id*. at 106, 111–13, 124, 131.)  Reid did not enter Dr. Jacobs' office, but Dr. Jacobs saw him through the open office door.  (*Id*. at 106.)  Jacobs testified that he heard "commotion" coming from the

4

office across the hall, and heard someone say "something like . . . I'll blow your head off." (*Id*. at 110.)

Both Zakharov and Dr. Jacobs recounted details of Reid's physical appearance, and stated that the office was "very well-lit." (*Id*. at 40.) Zakharov testified that Reid did not wear a mask or hat, and that there was nothing obscuring his face. (*Id*. at 17.) Zakharov, who is 5'11" stated that Reid was "somewhat shorter" than him, offering an estimate of 5'8", and he stated that he was "on the slim side," had an oval or round face, and uncombed hair. (*Id*. at 16, 57–59, 65, 84.) Dr. Jacobs testified that there were two men – a black male and a Hispanic male – and that he noticed the black man was taller than the Hispanic man. (*Id*. at 156.) The jury had the opportunity to view Reid and Mendez and assess their relative heights and weights. (*Id*. at 259–60.) Zakharov testified that Reid was wearing a brown leather jacket, dark jeans, and suede gloves, (*id*. at 14), and Jacobs recalled the gloves, as well, (*id*. at 111).

With respect to Mendez, Zakharov testified that Mendez wore a hooded sweatshirt and had a goatee, and that he smelled liquor on Mendez's breath. (*Id*. at 19, 27.) Dr. Jacobs also reported him as wearing a hooded sweatshirt and gloves. (*Id*. at 106, 111.)

Zakharov and Jacobs also testified about the lineup. Zakharov stated that he recognized Reid "right away," within "a few seconds," and that he felt "very certain" about the identification. (*Id*. at 38.) Jacobs stated that he did recognize someone in Reid's lineup, but that he chose not to identify him because he was not "100 percent" certain and was "afraid" of making a wrong identification. (*Id*. at 118.) Zakharov also identified Reid in court. (*Id*. at 15, 27–28.)

Dalton's testimony is at the heart of Reid's habeas petition. Dalton testified that after Mendez's arrest, he made a statement admitting that he went to the crime scene with "other

guys." Specifically, Dalton testified, "He told me that he went to the location with the guys, the guys went in the back, he was up front, he got scared and ran out." (*Id.* at 201.) Dalton did not ask Mendez any follow-up questions, such as who "the guys" were, nor did he record or write down the statement. (*Id.* at 208–13; 216–17.) Dalton justified the absence of any writing by pointing to the chaos of 9/11; he stated, "Since it was right after 911 and we were involved with the cleanup of Ground Zero . . . the papers got put aside." (*Id.*) To explain why he did not probe Mendez with follow-up questions, the People elicited Dalton's testimony that he had only been searching for two suspects, and that when Mendez was arrested, Reid was already in custody. (*Id.* at 222.) At trial, the People repeatedly emphasized that the crime was only committed by two men, (*see e.g.*, *Id.* at 83; 136–37; 222; 330), while the defense tried to cast doubt on their narrative by underscoring that Mendez said he and "other guys" (plural) committed the robbery. (*Id.* 317–18, 322–23, 324, 325, 330, 334.)[2] Other testimony created uncertainty about the number of perpetrators, as well. (*See* Tr. at 48, 51, 85.)

In summation, the prosecutor referenced Mendez's confession. In listing the evidence for the jury, he mentioned Zakharov's identification, and then stated:

> You have received the corroborating testimony of Dr. Jacobs and you have the defendant Mendez's statement in this case . . . . [T]alk amongst yourself [sic] about exactly how this evidence proves . . . . that Reggie Reid and Ricardo Mendez are responsible for this robbery . . . .

(*Id.* at 336.)

Neither Reid nor Mendez testified, and both relied on a misidentification defense. Reid argued that he had been misidentified because he lived in the neighborhood where Seagate was located. Reid's attorney, George Sheinberg, reminded the jury that it is common to recognize

---

[2] In his summation, Mendez's attorney also called attention to the fact that internal prosecution documents suggested there were six individuals involved in the robbery. (Tr. at 288.)

people in one's neighborhood, implying that Zakharov recognized Reid because he was a local and looked familiar.  (*See id*. at 159, 299–308.)

During the charge conference, Sheinberg did not voice objection to Justice Mangano's proposed charge.  Sheinberg stated only that he sought a *Daniels* charge.[3]  (*Id*. at 272.)  In his charge, Judge Mangano stated that, after determining whether Mendez's statement was accurate and voluntary, jurors could "consider [the confession] as evidence and evaluate it as you would any other evidence."  (*Id*. at 355.)  The Court did not provide a limiting instruction explicitly addressing the confession.  Judge Mangano also stated, "There are two defendants before you. We are, thus, conducting two trials in one.  It is your obligation to evaluate the evidence as it applies or fails to apply to each defendant separately."  (*Id*. at 339.)

During its deliberations, the jury asked for a readback of "all testimony regarding Mendez's confession," among other things.  (*Id*. at 414.)  The court also read back testimony "regarding how much information [the police] had regarding the number of people involved" to "explain why the follow-up questions were not asked by the officer."  (*Id.* at 414–15.)

On March 23, 2007, Reid was once again convicted of two counts of robbery in the first degree, in violation of New York Penal Law ("N.Y.P.L.") § 160.15(4), and three counts of robbery in the second degree, in violation of N.Y.P.L. § 160.10(1).  Reid was sentenced as a second felony offender to an aggregate prison sentence of 30 years.  (Tr. at 448–49.)

## IV.     The Direct Appeal and § 440 Motion

Reid timely appealed to the Appellate Division.  First, he argued that his Sixth Amendment right to confrontation was violated by the admission of Dalton's testimony repeating Mendez's post-arrest statement, and its introduction without any limiting instruction.  Next, he

---

[3] Sheinberg was referring to *People v. Daniels*, 88 A.D.2d 293 (2d Dep't 1982), which recommends a certain instruction when only eyewitness testimony connects defendant to a crime.

challenged the prosecutor's summation stating that Mendez's confession could be considered against Reid, and the court's instruction that the jury could consider the confession like any other evidence, provided it found that it was voluntary.  Reid asked the court to reach the unpreserved claims in the interest of justice, and in the alternative, he raised an ineffective assistance of counsel claim, primarily based on his attorney's failure to object to 1) the admission of Mendez's confession; 2) the absence of a limiting instruction; 3) the court's charge; and 4) the prosecutor's improper summation.  (Pet. at 23.)  Reid alleged other points of error, including the admission of incriminating hearsay testimony related to the investigation, and he also argued that his sentence was excessive.

On March 2, 2010, the Appellate Division modified Reid's sentence in the interests of justice, resulting in a twenty-year aggregate term of imprisonment.  *People v. Reid*, 71 A.D.3d 699, 699 (2d Dep't 2010).  However, the Court declined to reach Reid's Sixth Amendment confrontation claim, finding that he failed to preserve it.  *Id*. at 700.  The Appellate Division further found that counsel's failure to object to the admission of Mendez's confession did not amount to ineffective assistance because the "trial attorney's affirmative use of the statement may well have been in furtherance of trial strategy which would have been reasonable under the circumstances . . . in which case the defendant's claim . . . would have been waived."  *Id*. (citations omitted).  The remainder of Reid's claims were found to be either unpreserved or without merit.

On June 18, 2010, Reid's application for leave to appeal the Appellate Division's decision to the New York Court of Appeals was denied.  *People v. Reid*, 15 N.Y.3d 756, 933 (2010).

Reid also pursued a motion to set aside his sentence, dated May 13, 2010, pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.20. On September 27, 2010, Reid's motion was denied in a decision by the New York State Supreme Court, Kings County, and on July 8, 2011, Reid's application for leave to appeal the decision to the Appellate Division was denied. (Opp. at ¶¶ 14–15.)

### V.    Subsequent Motions

On May 9, 2011, Reid learned that a portion of the proceedings from his second trial had not been properly transcribed. The previously un-transcribed minutes showed that on the morning of October 11, 2006, Reid's attorney had made a severance application, arguing that Mendez's confession would likely be prejudicial to Reid, given that Reid would be "the only 'guy' sitting with" Mendez at trial. (Pre-trial Tr. (Doc. No. 1-2) at 89–91.) Reid's lawyer did not cite any case law and even implied that there was no relevant case law, though it was relatively clear that he raised a Confrontation Clause issue. (*Id*.) The severance motion was denied, as Judge Mangano found that the confession did not inculpate Reid, and stated that he would issue "a curative instruction as to its use." (*Id*. at 90–92.) Although Judge Mangano gave general instructions reminding the jury of its "obligation to evaluate the evidence as . . . to each defendant separately," he did not issue an instruction specifically ordering the jurors not to use Mendez's confession against Reid, and Sheinberg did not remind him to do so. When given the opportunity to take exception to the charge, Sheinberg declined. (Tr. at 272.)

Subsequently, on June 6, 2011, Reid filed a motion to renew or reargue his direct appeal, pursuant to C.P.L. § 2221, in light of the new minutes. Reid asserted that the complete transcript established that, contrary to the Appellate Division's finding, Sheinberg's failure to object to the admission of the confession was not strategic; rather, he sought to sever Reid's trial due to his

9

serious concern about the prejudicial statement.  Reid also argued that his motion to reargue should be granted "to afford him a fair appeal based on a record of sufficient completeness to permit proper consideration of his constitutional claims, adequate appellate review and an appeal free of constitutional doubt, and an adequate effective first appeal as of right with the effective assistance of appellate counsel."  (Pet. at 31.)  On October 4, 2011, Reid's motion to reargue was summarily denied.  On November 28, 2011, Reid's request for leave to appeal to the New York Court of Appeals was also denied.

On July 9, 2012, Reid, represented by counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, positing two grounds for relief.  On October 3, 2012, Reid filed an amended petition, adding a third ground.  (Am. Pet. (Doc. No. 6).)[4]

In his amended petition, Reid first asserts a claim for ineffective assistance of counsel based on his dissatisfaction with counsel's approach to the post-arrest confession.  Reid argues that the admission of the confession of a non-testifying co-defendant violated state law and his constitutional right to confrontation.  He contends that its admission destroyed his misidentification defense and enabled Mendez to "in effect [become] the second witness to inculpate him in the robberies."  (Pet. at 58.)  Reid argues that Sheinberg's failure to object to 1) the admission of the confession; 2) the absence of a limiting instruction; 3) the court's charge; and 4) the prosecutor's improper summation, was unreasonable.  He asserts that the outcome of his trial would have been different, but for Sheinberg's errors.  (Pet. at 53.)

In the second proposed ground for relief, Reid claims that he was denied his right to a fair appeal.  He argues that the Appellate Division denied him due process of law by affirming his conviction on direct appeal based on an incomplete trial record, and then denying his motion to

---

[4] Respondents never filed an opposition to the third ground for relief.  However, because the Court denies the petition in its entirety, there is no need to solicit a response from respondents.

reargue after he presented "previously-untranscribed and highly relevant minutes from his trial." (Pet. at 11.)

Reid's third proposed ground for relief alleges a violation of his right to confrontation under the Sixth Amendment, based on the admission of Mendez's confession. (Am. Pet. at 18–19.)

In opposition to Reid's petition, Respondents argue that all of Reid's claims are without merit. (Opp. at 26.) Respondents state that the un-transcribed minutes reveal that Reid's trial counsel timely objected to the admission of Mendez's statement, and thus, Reid's Confrontation Clause claim is fully preserved. (Opp. at 15.) Nevertheless, Respondents argue that Reid received meaningful representation and that the confession was properly admitted, as it did not inculpate Reid. (Opp. at 17.) Moreover, Respondents argue, even if the statement did violate Reid's confrontation rights, he fails to show that he was prejudiced by its admission. (Opp. at 19.) Finally, Respondents assert that Reid's due process claim does not present a federal question, and is meritless. (Opp. at 22.)

## DISCUSSION

### I.   AEDPA Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The standard is high because "the purpose of the AEDPA is to ensure that federal habeas relief functions as a 'guard against extreme malfunctions in the state criminal justice systems,' and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011)). A habeas petition is not an opportunity to relitigate issues previously decided in state trials. *See Herrera v. Collins*, 506 U.S. 390, 401 (1993) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).

Courts apply the AEDPA in two steps. *See Jackson v. Conway*, 763 F.3d 115, 133–34 (2d Cir. 2014). "The first is to identify the governing 'clearly established Federal law.'" *Id.* (citation omitted). "The second asks whether, in the context of the petitioner's case, the state court's decision was contrary to or an unreasonable application of that clearly established precedent." *Id.* (citing *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004); *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). A state court's decision is "contrary to" clearly established law when it "reached a conclusion of law that directly contradicts" a Supreme Court holding, or when it "arrived at a result opposite to that reached by the Supreme Court when presented with" materially indistinguishable facts. *Id.* at 134; *Smith v. Wenderlich*, 826 F.3d 641, 649 (2d Cir. 2016). A state court's decision is an "unreasonable application" of clearly established law when it "identifies the correct governing legal principle but unreasonably applies that principle to the facts of the case before it." *Evans*, 712 F.3d at 132 (internal quotation marks omitted) (quoting *Williams*, 529 U.S. at 413). "Unreasonable" in this context does not mean "incorrect" or "erroneous" – "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted) (citation omitted). Courts may not grant the writ unless the state court's decision was

12

"objectively unreasonable," or imbued with "some increment of incorrectness beyond error." *Evans*, 712 F.3d at 133 (internal quotation marks omitted).

For the reasons explained below, Reid fails to demonstrate that the Appellate Division's judgment denying his ineffective assistance of counsel claim was contrary to or an unreasonable application of clearly established federal law, and he fails to raise meritorious claims that his constitutional rights to confrontation or due process were violated.

## II.    Right to Confrontation

The Sixth Amendment's Confrontation Clause guarantees a defendant's right to confront the witnesses against him.  In *Bruton*, the Supreme Court held that a criminal defendant's right to confrontation is violated if the incriminating hearsay statement of a non-testifying co-defendant is introduced at the defendants' joint trial.  *Bruton v. United States*, 391 U.S. 123, 126 (1968); *see also Davis v. Washington*, 547 U.S. 813, 827–28 (2006); *Crawford v. Washington*, 541 U.S. 36, 68 (2004).  In *Richardson v. Marsh*, the Supreme Court distinguished between a confession that directly inculpates a defendant and one that is "not incriminating on its face," but becomes "so only when linked with evidence introduced later at trial . . . ."  481 U.S. 300, 208 (1987). Redacted confessions must be viewed in isolation from other evidence to evaluate their impact on the jury.  *See United States v. Jass*, 569 F.3d 47, 61 (2d Cir. 2009) (citing *Richardson*, 481 U.S. at 208–09); *United States v. Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (observing that *Bruton* asks whether the statement "standing by *itself*" implicates defendant); *Williams*, 936 F.2d at 700. As long as the confession standing alone is not incriminating, "even if the confession taken together with other evidence implicates the defendant, the confession may be admitted."  *United States v. Wimbley*, 18 F. App'x 24, 27–28 (2d Cir. 2001) (citation omitted); *see also United States v. Harris*, 167 F. App'x 856, 859 (2d Cir. 2006) ("[S]ubstituting a neutral pronoun or

word for any mention of a non-declarant defendant" . . . "satisfactorily addresses *Bruton*'s concern, even if other evidence in the case indicates that the neutral word or pronoun is a reference to the non-declarant defendant." (citing *Williams*, 936 F.2d at 700–01)); *United States v. Sanin*, 252 F.3d 79, 85 (2d Cir. 2001).  In *Jass*, defendant challenged the admission of a statement by her co-defendant that replaced Jass with "the other person."  *Id.* at 53.  Even though the confession seemed to refer to a woman, and even though Jass was "the only woman-indeed, the only person-on trial" with Leight, the Second Circuit concluded that "[a]t most . . . a juror might have inferred from [the] confession that the *prosecutor* believed Jass to be the other person that Leight acknowledged in his confession, but-as far as the jury was aware-did not specifically identify."  *Id.* 63.  Thus, the Court found that "the availability of this inference did not jeopardize Jass' right to confrontation."  *Id.*

The Second Circuit has repeatedly held that redacted confessions replacing the names of defendants with neutral references may resolve the confrontation problem.  In *United States v. Cambrelen*, the Second Circuit approved of the trial's court's replacement of the codefendants' names with "guy," "guys," or "the guys."  5 F. App'x 30, 35 (2d Cir. 2001).  In *United States v. Williams*, the Second Circuit approved of the use at trial of a redacted codefendant's confession where references to the Williams were replaced by "another guy."  936 F.2d 698, 700–01 (2d Cir. 1991).  The Second Circuit found in *United States v. Tutino* that "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names . . . may be admitted without violating a co-defendant's *Bruton* rights."  883 F.2d 1125, 1135 (2d Cir. 1989); *see also Gray v. Maryland*, 523 U.S. 185, 196 (1998) (where the Supreme Court itself suggested that "me and a few other guys" could serve as a proper redaction).

14

Here, then, the Court must ask whether Dalton's testimony "standing alone, would clearly inculpate" Reid "without further introduction of evidence." *United States v. Kyles*, 40 F.3d 519, 526 (2d Cir. 1994).  To reiterate, Dalton testified, "He [Mendez] told me that he went to the location with the guys, the guys went in the back, he was up front, he got scared and ran out." (Tr. at 200.)  The Court finds that a jury that heard only this testimony would not conclude that "other guys" clearly inculpated Reid.  The statement is vague; standing alone, it does not identify Reid in any way, shape, or form.  In fact, the statement was not redacted at all – Mendez never referred to Reid's name, but actually used the word "guys."[5]  Moreover, its effect on the jury's perception of Reid may be neutral.  It cannot be said that the confession inescapably points to Reid because "guys" is plural.  On the contrary, the statement likely created uncertainty in light of the prosecution's narrative that only two people robbed Seagate.  Defense counsel Sheinberg recognized that ambiguity and sensibly attempted to profit from it.  In *Amaker v. Lacy*, Judge Trager similarly found that a co-defendant's statement implying more than two people were at the scene of the crime did not inescapably point to petitioner.  941 F. Supp. 1340, 1345 (E.D.N.Y. 1996), (where co-defendant stated, "all of us had guns"), *aff'd*, 133 F.3d 906 (2d Cir. 1997).  "The fact that many people were described at the scene . . . contradicts the notion that [the co-defendant] had to be referring to the petitioner." *Amaker*, 941 F. Supp. at 1348–49.  Even if the testimony was susceptible to Reid's interpretation – that "the other guys" undoubtedly included Reid – given the lack of specific identifying information pointing to Reid, it would be "at least as reasonable to interpret the testimony" to mean that Reid was *not* included

---

[5] Note the pre-trial transcripts to Trial #1 show there was some dispute over whether he said "guy" or "guys" but that Dalton testified as to "guys." (Pre-trial Hearing at 148.)  Dalton's testimony is what is relevant here as that is what the jury heard.

in the group of culpable "guys." *See Bowen v. Phillips*, 572 F. Supp. 2d 412, 420 (S.D.N.Y. 2008).

The Court recognizes that in the cases cited above, defendants enjoyed the benefit of limiting instructions to control any prejudicial effect, however, here, the absence of a proper limiting instruction is immaterial because the Court finds there was no Sixth Amendment violation. While Reid alleges he suffered a "paradigmatic" Confrontation Clause violation, (Reply at 9–10), the cases he relies upon are distinguishable. In *Mason*, for example, the prosecutor elicited testimony from an investigator, stating that after the co-defendant confessed, he decided to search for Mason. *Mason v. Scully*, 16 F.3d 38, 45 (2d Cir. 1994). In finding that Mason's right to confrontation was violated, the Second Circuit highlighted that the evidence was so underwhelming that the jury was "hopelessly" deadlocked until after an *Allen* charge was given. *Id.* In that case, "[n]one of the three eyewitnesses who testified could specify any distinguishing characteristic" of Mason. *Id.* By contrast, here, Zakharov and Dr. Jacobs pointed to distinguishing characteristics of Reid, and Zakharov made a quick, confident identification in a lineup. *See Amaker*, 941 F. Supp. 1340, 1351 (finding *Mason* "easily distinguishable"). Similarly, Reid's reliance on *Henry* similarly does not advance his case. There, the confession at issue was "devastating to petitioner's claim of innocence," as it provided "highly prejudicial evidence" that "provided a complete and independent basis for the jury to find petitioner guilty beyond a reasonable doubt." *Henry v. Scully*, 918 F. Supp. 693, 717 (S.D.N.Y. 1995), *aff'd*, 78 F.3d 51 (2d Cir. 1996). It simply cannot be said that Mendez's statement had an equivalent "disastrous" effect on Reid. *Id.* at 699. The effect of the confession here was significantly "more attenuated than in *Mason*." *Alston v. Phillips*, 476 F. App'x 907, 910 (2d Cir. 2012). The fact that the jury asked to review Dalton's testimony does not necessarily indicate they used the

confession against Reid; it could just as easily indicate they were confused and sought clarification.  The jury "may well have failed to catch the possible inference." *Id*.  Distinct from the cases Reid cites, "the implicit accusation . . . was at most a peripheral component" of the prosecution's case, the center of which was "eyewitness testimony . . . entirely independent of the challenged indirect statement." *Id*.

### a. Harmless Error

In any event, even if the Court were to identify a constitutional error, it would be harmless.  It is well-established that *Bruton* violations are subject to harmless error analysis.  *See United States v. McClain*, 377 F.3d 219, 222 (2d Cir. 2004); *Fuller v. Goczyk*, 273 F.3d 212, 220 (2d Cir. 2001); *Bowen*, 572 F. Supp. 2d at 419 ("Even when a Confrontation Clause violation has occurred, a habeas corpus petition cannot be granted if the error was harmless.").  Under *Brecht*, a state court's error is harmless unless it had "substantial and injurious effect or influence in determining the jury's verdict."  507 U.S. 619, 637 (1993) (internal quotation marks omitted) (citation omitted); *see also Fry v. Pliler*, 551 U.S. 112, 121–22 (2007) ("[I]n § 2254 proceedings a court must assess the prejudicial impact . . . under the . . . standard set forth in *Brecht*.").  To satisfy the *Brecht* standard, a petitioner must show that he suffered "actual prejudice."  *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994).  A petition may not be granted if there is "merely a 'reasonable possibility' that trial error contributed to the verdict."  *Id*. (quoting *Brecht*, 507 U.S. at 637); *see also Ryan v. Mann*, 73 F. Supp. 2d 241, 252 (E.D.N.Y. 1998), *aff'd*, 201 F.3d 432 (2d Cir. 1999).  The Second Circuit weighs several factors in assessing whether the *Brecht* standard has been met, including the strength of the prosecution's case and whether the evidence admitted in error was "crucial, critical, [or] highly significant."  *Collins v. Scully*, 755 F.2d 16, 19 (2d Cir. 1985).  The prosecution's case may be "the most significant factor," but "the court

need only find the prosecution's case to be weighty, not overwhelming." *Ryan*, 73 F. Supp. 2d at 253 (citing *Glenn*, 98 F.3d at 729).  Moreover, "to conclude that the error was harmless . . . we need not find that the improperly admitted evidence had no effect at all, we need only find that the effect was not substantial and injurious." *Samuels v. Mann*, 13 F.3d 522, 528 (2d Cir. 1993) (citing *United States v. Rea*, 958 F.2d 1206, 1220 (2d Cir. 1992)); *see also Ruiz v. Kuhlmann*, 80 F. App'x. 690, 694 (2d Cir. 2003) (habeas petition properly denied despite *Bruton* violation in light of "compelling" testimony of two eyewitnesses "identifying petitioner as one of the shooters").

Here, the People have demonstrated that Mendez's confession did not have a "substantial and injurious effect or influence" on the jury's verdict.  Viewing the record as a whole, Reid's conviction did not rise and fall on the confession.  While the People presented only a single eyewitness, Zakharov's identification was strong.  Zakharov testified under oath that he recognized Reid in the lineup "right away," within a "few seconds," and that he was "very certain."  (Tr. at 38.)  It appears that he had ample opportunity to observe the perpetrators and to look at Reid's face during the five- to ten-minute incident, (Tr. at 30, 64, 114), and Seagate, like most medical facilities, was "very well-lit," (Tr. at 40, 113).  Zakharov said that Reid did not have anything covering his face.  He said he could see Reid "very well," and that he looked at Reid's face – "his eyes, nose, lips, [and] chin."  (Tr. at 11, 16–17, 63–64, 10–12, 45–46, 49, 59, 74.)  He testified:  "I was looking at him. . . . his body movements, his hand in his pocket," (Tr. at 16), and Zakharov was "listening to what he [was] saying, observing him, looking nowhere else, really," (Tr. at 17).  Zakharov testified in detail about Reid's outfit, including the color and material of his gloves – he stated that Reid was wearing a brown leather jacket and dark jeans, and he noticed that he was wearing suede gloves despite the weather not being particularly cold.

(Tr. at 14, 59, 65–66.)  His detailed memory of the events is consistent with his testimony that he was "pretty scared, intimidated" and "wanted to be alert."  (Tr. at 23.)  The fact that Zakharov was present with Reid for several minutes and had no known reason to lie, likely allowed jurors to find his detailed testimony and confident identification credible.  As Judge Mangano charged the jury:  "The law is not so much concerned with the number of witnesses called as with the quality of the testimony given."  (Tr. at 356.)

Further, while Dr. Jacobs chose not to identify anyone in the lineup, he testified under oath that he recognized someone.  Moreover, his testimony corroborated Zakharov's account of the perpetrators and the crime.  Jacobs recalled that Reid was wearing gloves, (Tr. at 111); that the robbers were both male (one black, one Hispanic); and that the Hispanic robber was shorter than the black robber, (Tr. at 157).  Like Zakharov, Jacobs recalled hearing threats to "blow [their] heads off."  (Tr. at 17, 31, 110.)  The jurors also viewed the defendants themselves, and were able to assess relative heights.  (Tr. at 258–59.)  Moreover, they heard Close testify that he received information that led him to Reid, and that Reid lived one block from Seagate.  (Tr. at 150, 158–59, 188.)

Even if the prosecution's case was not overwhelming, the prosecution "provided sufficiently weighty evidence to far outweigh the prejudice triggered by [any alleged] *Bruton* violation."  *Ryan*, 73 F. Supp. 2d at 254.  Mendez's confession, even if admitted erroneously, was "not only short in duration, but also, not particularly powerful in impact," given that standing alone, it did not inculpate Reid.  *Ryan*, 73 F. Supp. 2d at 254.  Here, the Court cannot find that the testimony was "crucial, critical, [or] highly significant" to the jury's verdict, as a reasonable jury could have convicted Reid based on other evidence presented at trial.  *Collins*, 755 F.2d at 19.  Accordingly, the Court finds that Dalton's testimony did not have a "substantial

and injurious effect or influence" on the verdict, and thus, even assuming *arguendo* there was a *Bruton* violation, that error was harmless.  *Brecht*, 507 U.S. at 637.

### a. State Law

Finally, Reid's argument that the admission of Mendez's confession violated New York state law fails to recognize that "a federal habeas corpus court does not sit to correct a misapplication of state law unless the misapplication violates the United States Constitution" or federal law.  *Ponnapula v. Spitzer*, 297 F.3d 172, 182 (2d Cir. 2002); *Taylor v. Phillips*, No. 05-CV-2596 (DRH), 2016 WL 5678582, at *7 (E.D.N.Y. Sept. 30, 2016).  § 2254(a) expressly refers to the writ as providing relief for violations of "the Constitution or law or treaties of the United States."  Indeed, it is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions."  *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *see also Downs v. Lape*, 657 F.3d 97, 105 (2d Cir. 2011); *Carvajal v. Artus*, 633 F.3d 95, 109 (2d Cir. 2011) ("[W]e have no occasion to decide whether there was error in the state court's statutory interpretation [of New York law]").  To the extent that Reid argues that New York state law differs from federal law, "it is only noncompliance with *federal* law that renders a state's criminal judgment susceptible to collateral attack in the federal courts."  *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (per curiam); *see also Howard v. Walker*, 406 F.3d 114, 121 (2d Cir. 2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.").

### III.   Ineffective Assistance of Counsel

In his second proposed ground for relief, Reid argues that he received ineffective assistance of counsel.  In *Strickland*, 466 U.S. 668 (1984), the Supreme Court set out a two-pronged test for ineffective assistance of counsel claims.  Under the first prong, a petitioner must

show that counsel's performance "fell below an objective standard of reasonableness." *Id*. at

688.  In assessing reasonableness, courts "must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance; that is, the defendant

must overcome the presumption that, under the circumstances, the challenged action 'might be

considered sound trial strategy.'" *Id.* at 689 (citation omitted); *United States v. Best*, 219 F.3d

192, 201 (2d Cir. 2000) (quoting *Strickland*, 466 U.S. at 689).  With respect to the second prong,

a petitioner must demonstrate "that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  The

Supreme Court defines "reasonable probability" as "a probability sufficient to undermine

confidence in the outcome." *Id.*; *Harrington*, 562 U.S. at 104 ("Counsel's errors must be 'so

serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" (quoting

*Strickland*, 446 U.S. at 687, 693)).  The *Strickland* test is conjunctive; thus, if a petitioner fails to

satisfy either prong, his ineffective assistance claim fails.  *See Rosario v. Ercole*, 582 F. Supp. 2d

541, 575 (S.D.N.Y. 2008) (citing *Strickland*, 466 U.S. at 697), *aff'd*, 601 F.3d 118 (2d Cir.

2010).

> The AEDPA requires federal courts "to accord deference to the state court's ruling on

claims of ineffective assistance of counsel." *Santone v. Fischer*, 689 F.3d 138, 154 (2d Cir.

2012); *see also Hamilton v. Lee*, 707 F. App'x 12, 15–16 (2d Cir. 2017), *cert. denied sub nom.*

*Hamilton v. Griffin*, 138 S. Ct. 668 (2018).  Further, reviewing courts must show deference to the

defense counsel's choices at trial, pursuant to *Strickland*.  *See Harrington*, 562 U.S. at 105; *Rivas*

*v. Fischer*, 780 F.3d 529, 547 (2d Cir. 2015).  Ultimately, "the question is not whether counsel's

actions were reasonable.  The question is whether there is any reasonable argument that counsel

satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

In Reid's case, there is at least a reasonable argument that trial counsel satisfied *Strickland*.  First, counsel's performance was not constitutionally defective.  It was reasonable for the Appellate Division to find that counsel's strategy was to use the confession affirmatively rather than object to its use.  Despite Reid's argument to the contrary, this finding is consistent with the severance motion; it is entirely possible, and in fact supported by the record, that Sheinberg shifted strategies after his motion was denied.  Once he accepted that the confession would be introduced, Sheinberg took advantage of the challenged testimony to advance the defense of misidentification, or at least to create uncertainty as what transpired on September 14, 2001.  Indeed, counsel deftly attempted to inject doubt into the prosecution's narrative.  On cross-examination, Sheinberg asked Dalton, "guys means plural, isn't that right?"  (Tr. at 208.) He read Mendez's statement to the jury in summation, asking, "What guys?  Who was there? Who are the other guys?"  (Tr. at 307.)  Sheinberg also used the confession to create questions about the integrity of the investigation.  In his summation, Sheinberg highlighted Dalton's failure to ask Mendez follow-up questions, such as the names of "the guys," calling it "insane" in summation and arguing that "the excuse of 9/11" was unacceptable.  (Tr. at 308.)  On cross-examination, Sheinberg asked Dalton, "Did you ask any other questions? . . . did you say, which guys, what guys, where did they live? . . . did you ask him anything of that nature?", to which Dalton replied, "I don't recall."  (Tr. at 210–11.)  Sheinberg may have reasonably used this line of questioning to encourage the jury to doubt Dalton, particularly given the dearth of information the jury had on how the detectives landed on Reid as a suspect.  Sheinberg further enhanced this strategy by developing testimony aimed at portraying Dalton and Closs as disorganized, highlighting how they failed to take notes, to record Mendez's statement, and to contact certain

witnesses, such as Seagate patients and the responding officers.  (*See, e.g.*, Tr. at 210, 212, 216, 307.)

In pursuit of his strategy to use the confession affirmatively, Sheinberg could have reasonably decided not to call attention to any potential negative interpretation of the confession. Accordingly, there is at least a reasonable argument that Sheinberg's decision to refrain from objecting to the absence of a limiting instruction, the prosecutor's summation, or the Court's charge was a reasonable strategy.  In some circumstances, objecting may only serve to "highlight the implication for the jury."  *Alston v. Phillips*, 703 F. Supp. 2d 150, 182 (E.D.N.Y. 2010), *aff'd*, 476 F. App'x 907 (2d Cir. 2012).  While this was not the only viable strategic choice here, it was a reasonable one, and thus the Court cannot find that defense counsel's performance fell outside the "wide range" of reasonableness.

With respect to the second prong, it cannot be said that Reid's counsel failed to protect his right to confrontation in a way that prejudiced him at trial.  The Court has concluded, *supra*, that the admission of the confession did not amount to a *Bruton* violation, and that any *alleged* error would be harmless.  To be sure, counsel's severance application was not a model of clarity. However, counsel's lackluster motion practice does not rise to the level of constitutional deficiency because Mendez's confession was not, on its own, prejudicial to Reid.  Any prejudice was minimized if not negated entirely by counsel taking advantage of the confession in an effort to create doubt about the prosecution's case.  Viewing counsel's performance in totality, it cannot be said that any error changed the result of the proceeding or deprived Reid of a fair trial.

As Reid is unable to show that the state court's determination was an unreasonable application of *Strickland* or an unreasonable determination of the facts, his claims are dismissed.

## IV.    Right to Due Process

In the third and final proposed ground for relief, Reid asserts that he was deprived effective appellate review in violation of his right to due process.  First, he contends that the Appellate Division "did not provide him with a record of sufficient completeness" and its dismissal of his direct appeal was "based upon a materially incomplete record." (Pet. at 62.) Second, Reid argues that the Appellate Division's "unexplained denial" of his motion for reconsideration, its refusal to consider Reid's claims "in light of the full record," "and its resultant adherence to its . . . incorrect determination," denied him due process of law.  (Am. Pet. at 17.)

Neither federal law nor the United States Constitution guarantees criminal defendants the right to appeal state convictions.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Ross v. Moffitt*, 417 U.S. 600, 611 (1974); *Lovacco v. Stinson*, No. 97-CV-5307 (SJ), 2004 WL 1373167, at *11 (E.D.N.Y. June 11, 2004).  Once a state does establish a criminal appellate system, the Supreme Court has determined that the process must meet certain fairness requirements; namely, defendants may not be denied an opportunity to appeal due to indigency or lack of representation.  *See Douglas v. California*, 372 U.S. 353 (1963) (on the right to counsel in a criminal appeal); *Griffin v. Illinois*, 351 U.S. 12 (1956) (on the cost of appeal as a barrier). However, there is no federally created right to appeal a state criminal conviction.

By extension, Reid does not have a federal or constitutional right to file a motion to reargue his direct appeal.  In *Velazquez*, Judge Vitaliano disposed of a similar claim that the Appellate Division "ignored" petitioner's motion to reargue, concluding that "[f]ederal law does not guarantee the right to appeal state criminal convictions."  614 F. Supp. 2d 284, 345 (E.D.N.Y. 2007).  Reid's due process claim is not driven by his indigency or inability to procure

24

counsel on appeal.  Therefore, "[b]ecause those are the only aspects of the state appellate process that a federal court may consider on habeas review, the instant claim is not reviewable." *Lovacco*, 2004 WL 1373167, at *11.

Furthermore, a missing transcript does not confer automatic entitlement to relief.  In addressing an indigent defendant's access to transcripts, the Supreme Court has held, "[O]nce a State offers to criminal defendants the opportunity to appeal their cases, it must provide a trial transcript to an indigent defendant if the transcript is necessary to a decision on the merits . . . ." *Ake v. Oklahoma,* 470 U.S. 68, 76 (1985); *see Griffin*, 351 U.S. at 19.  However, records need only be "sufficiently complete" to afford defendants a fair appeal and they may conform to due process "even absent 'a complete verbatim transcript.'"  *Hernandez v. Larkin*, No. 12-CV-8090 (AJN) (SN), 2013 WL 4453316, at *20 (S.D.N.Y. Aug. 19, 2013) (quoting *Mayer v. Chicago*, 404 U.S. 180, 194 (1971)).  In order to demonstrate that an incomplete transcript caused a due process violation, habeas petitioners must establish that they suffered actual prejudice.  *See Santiago v. Coughlin*, 107 F.3d 4, 1997 WL 32924, at *1 (2d Cir. 1997); *McCray v. Barkley*, 03-CV-04821 (DAB) (GWG), 2004 WL 32931, at *11–12 (S.D.N.Y. Jan. 7, 2004); *Hernandez*, 2013 WL 4453316, at *20 (collecting cases).  Mere speculation that petitioner suffered prejudice does not suffice.  *See Walker v. Martuscello*, No. 14-CV-7458 (JPO), 2016 WL 2732195, at *7 (S.D.N.Y. May 10, 2016); *Maxwell v. Conway,* 06-CV-14203 (KMK) (LMS), 2010 WL 4273296, at *2 (S.D.N.Y. Oct. 28, 2010) (citations, brackets and internal quotation marks omitted); *Quinones v. New York State Div. of Parole*, No. 07-CV-8633 (LBS), 2008 WL 2276540, at *5 (S.D.N.Y. June 2, 2008) (petition dismissed where missing *voir dire* transcript suggested "possible, not actual harm"); *Van Stuyvesant v. Conway,* 03-CV-03856 (LAK), 2007 WL 2584775, at *37 (S.D.N.Y. Sept. 7, 2007) (denying petition when claim of prejudice was

speculative); *McCray v. Barkley*, No. 03-CV-4821 (DAB) (GWG), 2004 WL 32931, at *12 (S.D.N.Y. Jan. 7, 2004) (petitioner failed to supply evidence that "the missing portions of the transcript reflect reversible error" (internal quotation marks omitted) (citation omitted)).  Where a petitioner "fail[s] to identify a meritorious appellate issue that the missing minutes would have revealed," his due process rights have not been violated.  *Id.*

Here, Reid has failed to sufficiently allege actual prejudice.  Reid claims that the minutes he uncovered constitute "clear and convincing" evidence undermining the Appellate Division's determination that Sheinberg used the confession strategically.  However, as noted *supra*, strategic use of the confession is not inconsistent with the severance motion, as strategy may shift over the course of a trial.  Thus, the unveiling of new minutes did not require the Appellate Division to alter its judgment – even if with a complete transcript, the Appellate Division could have reasonably dismissed Reid's claim for ineffective assistance of counsel.  Additionally, while the complete transcript revealed that Reid's Confrontation Clause claim was arguably preserved, this Court has found that this claim is without merit.

As Reid suffered no actual prejudice from the incomplete transcript, the Court finds that the Appellate Division did not infringe upon his right to a fair appeal.  Consequently, the Court must also find no error in the denial of Reid's motion to reargue.  While the Appellate Division did not issue an elaborate opinion dismissing Reid's motion to reargue – or any statement explaining its adherence to its prior decision – courts are not obligated to do so under federal or constitutional law.  *See Velazquez*, 614 F. Supp. 2d at 284 (petitioner's "allegation concerning the brevity of the Appellate Division's decision is . . . meritless").  As Reid has failed to demonstrate a denial of his right to a fair appeal, his due process claim must be dismissed.

## CONCLUSION

For the reasons set forth above, Reid's petition for a writ of habeas corpus is denied and this action is dismissed.  A certificate of appealability shall not issue because Reid has not made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  The Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order, to mail a copy of the judgment and this Memorandum and Order to Reid, to note the mailing on the docket, and to close this case.

SO ORDERED.

Dated:  Brooklyn, New York
      July 2, 2020

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
Chief United States District Judge